### In re PACAT FINANCE CORPORATION.

(District Court, S. D. New York. May 22, 1923.)

1. **Banks and banking ⬅188½—That foreign exchange bought is to be transferred by cable does not change the legal effect of the transaction.**

   That an agreed transmutation of dollars into francs is to be effected by a cable transfer, instead of delivery in person or by messenger, does not change the legal effect of the transaction.

2. **Bankruptcy ⬅140(3)—Bankrupt held not to have acquired title to money paid it in a cash transaction, where it failed to perform.**

   An executory contract by bankrupt to deliver to claimant a sum in francs in Paris, in consideration of a payment in dollars to be made in New York on the same day, sufficiently far in advance to enable bankrupt to make the transfer by cable, was one for simultaneous performance, involving no extension of credit, and where bankrupt failed to perform, title to the money paid it in New York did not pass, and it may be traced by claimant into the hands of the trustee and recovered.

3. **Bankruptcy ⬅140(2)—Bankrupt held chargeable with fraud, which entitled a claimant to follow and reclaim money paid it.**

   Materially false statements, made by an officer of bankrupt corporation to a financial agency, and communicated to claimant, and also false statements made direct to claimant, together with the fact that bankrupt accepted large sums of money from claimant in cash transactions, when its officers knew it to be wholly insolvent and unable to fulfill the contracts, *held* to establish actual fraud, which entitled claimant to rescind, and to follow and reclaim the sums paid.

4. **Bankruptcy ⬅140(3)—Purchaser from bankrupt of foreign draft, which was dishonored, cannot rescind after bankruptcy.**

   A purchaser of a foreign draft from bankrupt, who received the draft, though it was dishonored, in the absence of fraud which invalidates the transaction, must be held to have relied on the credit and solvency of the drawer, and cannot rescind and recover the amount paid after bankruptcy.

5. **Bankruptcy ⬅212—Claimant of trust fund required to allow set-off.**

   A claimant, who seeks to rescind a contract with bankrupt for fraud and to reclaim the amount paid thereon as a trust fund, will be required as an equitable condition to allow as a set-off an indebtedness from him

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to bankrupt, though arising out of a separate transaction, and not legally subject to set-off against the trust fund.

**6. Bankruptcy ☞162—Creditor cannot secure preference by foreign attachment after bankruptcy.**

An American creditor cannot secure a valid preference, which will be recognized and enforced by the bankruptcy court, by attachment after bankruptcy, and with knowledge thereof, of property or credits of bankrupt in a foreign country.

**7. Bankruptcy ☞140(2)—Seller of bonds to bankrupt held entitled to rescind the sale for fraud.**

An agreement by bankrupt to purchase foreign bonds from claimant, followed by a forwarding of the bonds to bankrupt, with directions to deposit the agreed price in a bank to claimant's credit, if not shown to have been intended as a cash transaction, with delivery and payment as concurrent acts, clearly shows an intention that payment should be made promptly, and receipt and sale of the bonds by bankrupt without payment, and with knowledge of its insolvency, *held* to establish such fraud as to entitle claimant to rescind and to follow the proceeds of the bonds as a trust fund.

**8. Bankruptcy ☞140(3)—Mere direction to correspondent bank to transfer money to another, not complied with, does not create trust fund.**

A mere direction by one party to a contract to a correspondent bank to transfer money from its account to the credit of the second party, which was not done, does not amount to an appropriation of any part of the deposit of the first party to the contract, so as to impress the deposit with a trust in favor of the second party, as respects claim against bankruptcy trustee.

**9. Bankruptcy ☞140(3)—Transaction held not to create trust in favor of claimant.**

Bankrupt, pursuant to a contract, directed its correspondent bank in Vienna to transfer a sum in kronen from its account to the credit of claimants. Under a government regulation, this could not be done directly, because claimants were foreigners, whereupon, the exchange value of kronen having fallen, claimants demanded back the American money paid, and pending the controversy the bankruptcy occurred. *Held*, that bankrupt's Vienna account was not impressed with any trust in favor of claimants, but their status was that of general creditors.

In Bankruptcy. In the matter of the Pacat Finance Corporation, bankrupt. On exceptions to report of special master. Confirmed, with modifications.

The report of Joseph M. Proskauer, Special Master, here follows:

By order made on the 15th of March, 1921, it was directed that all reclaiming creditors of the bankrupt file their claims, and that the determination of all their right, title, and interest be referred to me as special master. I was additionally directed to adjust, determine, and adjudicate "the rights, titles, interests, equities, claims, and liens of the parties, and report my determination." I took the oath as special master, which is annexed to my report. Pursuant to this order 28 claimants filed petitions; 13 of these claimants withdrew their petitions, and the petitions of 15 claimants are before me for report. Several of these involve a number of distinct claims.

The primary business of the bankrupt was dealing in foreign exchange. The hearings have been protracted and difficult, by reason of the complicated questions of law and fact arising from a variety of foreign exchange transactions. A most helpful attitude was taken throughout by counsel for the trustee. While defending the rights of the trustee with great skill, he has nevertheless facilitated his adversaries and the special master by supplying, frequently in lucid summary form, a large volume of evidence relating to ex-

changes of correspondence, the state of various bank accounts, and the basis of many separate transactions. Much labor was thereby imposed upon him, and by the assumption of this responsibility he assisted in the development of a record which presents the issues clearly.

As the claim of the National Shawmut Bank of Boston involves the most important of the fundamental questions to be determined, this claim will be first considered.

### The Claim of the National Shawmut Bank of Boston.

On December 20, 1920, the National Shawmut Bank of Boston (which, for convenience, will hereafter be designated as Shawmut) made an agreement with the bankrupt, by which, in consideration of the payment of $58,627.50 to the bankrupt in New York on December 22, 1920, the bankrupt engaged to pay 1,000,000 francs in Paris on December 22, 1920. A similar transaction was entered into on December 20, 1920, for the payment by Shawmut of $118,890 in New York, and payment by the bankrupt abroad of 3,500,000 lire on December 23, 1920; and additional transactions were entered into on December 22 and 23, 1920, by which Shawmut engaged to pay to the bankrupt in New York $185,952.50, and the bankrupt engaged to pay abroad 13,500,000 marks on December 28, 1920. Shawmut lived up to its engagements, and paid $58,627.50 on December 22, $118,890 on December 23, and $185,952.50 on December 28, 1920. These sums were all deposited in the account of the bankrupt with the National Park Bank of New York.

All question of tracing and marshaling I shall reserve for a later section of this report. I shall here consider the question whether Shawmut is entitled to reclaim such portion of its payments as may be traced and properly marshaled to it. The exact legal nature of the business transactions described must be first determined. They were all founded upon written memoranda, identical in character, save for change of date, amount, and foreign currency. For purpose of illustration, I quote Shawmut's Exhibits X14 to X16.

The bankrupt sent to Shawmut the two papers, Exhibits X14 and X15, which Shawmut confirmed by Exhibit X16.

### Exhibit X14.

"New York, December 20, 1920.
"Pacat Finance Corporation, 42 Broadway,
"Foreign Exchange Division.

"Messrs. National Shawmut Bank of Boston, Boston, Mass.—Gentlemen: This is to confirm that we have sold you to-day, through Ernst Rosenfeld, Fcs. 1,000,000. Cable Paris at 5.86¼ for delivery December 22, 1920. Kindly confirm and greatly oblige.
"Very truly yours,                Frank Bailey, Assistant Treasurer."

### Exhibit X15.

"New York, December 20, 1920.
"National Shawmut Bank of Boston, Boston, Mass.
"Ref. No. PFC 1239.
"To Pacat Finance Corporation, Dr., 42 Broadway, New York:

For cable transfer Paris—Fcs. 1,000,000, at 5.86¼ ............$58,625.00
Cost of cable ...............................................   2.50
         Amount due .........................................  $58,627.50

"Payable here and abroad on December 22, 1920.
"To Guaranty Trust Company, Paris, France, Through Comptoir National d'Escompte de Paris, France.
"The Pacat Finance Corporation or its correspondents, in effecting this transfer or payment of funds either by cable or telegraph, assumes no liability, and it is agreed is not responsible, for any loss or delay in transmitting the message, or for any cause beyond its control."

Exhibit X16.

"The National Shawmut Bank of Boston, Foreign Department.

"Boston, Mass., Dec. 21, 1920.

"Pacat Finance Corp., 42 Broadway, N. Y.—Gentlemen: We beg to confirm having bought of you through E. Rosenfeld cable transfer payable December 22d for Fcs. 1,000,000 at 5.86¼, which please pay for our account to Guaranty Trust Co. of N. Y., Paris. Proceeds will be paid to you through First National Bank, N. Y.

"Yours very truly,     The National Shawmut Bank of Boston,
"W. J. Hartney, Assistant Mgr."

In interpreting the legal effect of these documents, I look to their essence, and discard any extreme inference to be drawn from the mere conventional, though legally inexact, use of a word. St. Regis Paper Co. v. Hubbs, 235 N. Y. 30, 138 N. E. 495. Thus I agree with the argument of the trustee that the transaction is not in legal effect a sale. Equitable Trust Co. v. Keene, 232 N. Y. 290, 133 N. E. 894, 19 A. L. R. 1137.

I agree, also, with his contention that the transaction did not operate as an assignment of any funds. Moreover, I think it clear that the money paid by Shawmut did not in the first instance constitute a trust res, in the sense that the particular money paid to the bankrupt was to be transmuted into the foreign currency. In sustaining the right of reclamation, I am mindful of the decision of the Circuit Court of Appeals of this Circuit in Re Bolognesi & Co., 254 Fed. 770, 166 C. C. A. 216, and of the Court of Appeals in Legniti v. Mechanics & Metals Nat. Bank, 230 N. Y. 415, 130 N. E. 597, 16 A. L. R. 185, both of which denied the character of a trust res to payments made in a certain form of foreign exchange transaction. The right of reclamation here rests on different grounds, which distinguish this case entirely from the authorities cited. In both those cases the unsuccessful claimants went to the banker, paid money, and either actually received a draft in exchange or rested content with the engagement of the banker to transmit in the future foreign credit by cable or by draft. As to draft purchasers Judge Hough writes in the Bolognesi Case, 254 Fed. 770, at page 772, 166 C. C. A. 216, at page 218: "But those claimants who came to the bankrupt to buy drafts and the like, and got what they bargained for, cannot claim against the fund, for their bargains were completed."

This represents one class of foreign exchange transaction. A second class is represented by the transaction in the Legniti Case, where the customer paid his money to the bank, and the bank agreed to transmit the foreign exchange at some reasonable time in the future. There the engagement is unconditioned, and the so-called purchaser is relying upon the credit and solvency of the so-called seller.

But in the instant case the transaction took a third and very different form. Here the parties contracted in advance of the day of performance that *on a specified day* in the immediate future (the interval, according to the testimony of the expert witness Rosenfeld, being merely sufficient for cable transmission), each party would perform; that on the specified day the so-called buyer would pay here, and on the very same day the so-called seller would pay abroad.

The understanding of this transaction by those engaged in the business is thus clearly stated by the witness Rosenfeld: "A spot transaction is a transaction which is made for immediate delivery, payable here and there on the same day." By immediate delivery the witness meant, not the same day, but the lapse of sufficient time to permit the transmission of the cable. The witness continues: "That always necessitated the sending off of the actual cable on the date on which the transaction was consummated, until the due date, by which I mean the date of the actual transfer of money simultaneously in both places."

This seems to me to state, in the language of an experienced business man, what must be held to be the legal effect of these memoranda. The letter of confirmation written by Pacat (Exhibit X14) must be read with the bill or invoice (Exhibit X15), dated the same day. The force of the phrase in Exhibit X15, "Payable here and abroad on December 22, 1920," is controlling.

If there had been an intent that Shawmut should rely on the unconditioned engagement of Pacat, it is extremely unlikely that the invoice, dated the same day with the confirmation, would have postponed the dollar payment to the same date upon which the franc payment was to be made, and this improbability is transformed into substantial certainty of an opposite intent by the express use of the phrase that the dollars and francs were both to be paid on the specified future day. Confirmation is also given to this view by the form of the Shawmut letter, which states that the "proceeds" will be paid to Pacat on the postponed date, though I do not regard this phrasing as essential to the maintenance of the view here expressed.

In legal effect, the intent of the parties here was to make an executory bilateral contract that on a certain day each would perform concurrently with the other's performance. In this aspect it was exactly like an executory contract to sell merchandise on a future day for cash. The bankrupt wholly failed to perform. On the lire and franc transactions it did not even send a cable until December 29th, the day before the bankruptcy, though these payments should have been made on December 22d and December 23d, respectively. On the mark transaction it did send the cable on the day fixed, December 29th, but had not sufficient funds on deposit in Germany to meet its order of payment. It thus wholly failed to perform the concurrent conditions, and Shawmut is entitled to follow its payments into the hands of the trustee. Matter of Perpall, 256 Fed. 758, 168 C. C. A. 104; In re Ennis, 187 Fed. 720, 109 C. C. A. 468; In re Syracuse Gardens Co. (D. C.) 231 Fed. 284; Empire State Type Founding Co. v. Grant, 114 N. Y. 40, 21 N. E. 49.

The principle for which these cases stand is thus well stated in Leven v. Smith, 1 Denio (N. Y.) 571: "Payment and delivery were to have been simultaneous. No credit was given, and there is no evidence that the delivery to the defendant was intended to be absolute, or that the condition of payment was waived; and the mere handing over the goods under the expectation of immediate payment did not constitute an absolute delivery. The defendant, after such delivery, held the goods in trust for the plaintiffs until payment was made or waived." Applying this principle to the present situation, on the failure of the performance of the concurrent condition by Pacat, Pacat held the moneys received by it from Shawmut in trust for Shawmut.

Shawmut also rests its right of recovery on the claim of fraud, which claim is sustained by the following facts:

(a) In 1920 Shawmut received from the Bradstreet Agency a report on the Pacat Finance Corporation. This report was based on oral statements made by Kirk Landau, an officer of the Pacat Finance Corporation, to Mr. Dienst, a Bradstreet reporter. I find as a fact that Landau did make the statements set forth in Dienst's testimony, and on the basis of these statements the Bradstreet Company reported that $250,000 in cash had been paid in to the capital of the Pacat Finance Corporation. This was a material statement, was in fact untrue, and was relied upon by Shawmut. Less controlling, but still significant, is the false statement which I find was made by Kirk Landau to Mr. Bolinger, the vice president of Shawmut, to the effect that Pacat was not speculating in exchange, but was buying either to fill orders for foreign banks or in connection with bona fide commercial transactions.

(b) I find as a fact that, at the time of the transactions in question, Pacat was insolvent to the knowledge of its officers, under circumstances which conclusively point to the existence of an intent to defraud. The history of the formation of the Pacat Finance Corporation is as follows:

In December, 1918, Kirk A. Landau organized the Pacat Steamship Corporation, with an authorized capital of $50,000. This company earned profits in 1919 and early in 1920. In the summer of 1920, or theretofore, its business fell off, so that in December, 1920, it had substantially no assets and owed some $270,000. In June, 1920, when its stock was turned over to the Pacat Finance Corporation, its stock had a book value of $200,000. It lost in exchange in August, 1920, $153,000, and made in October and November $40,000 to $50,000. It had started dealing in foreign exchange in March, 1920, and in June, 1920, the bankrupt, Pacat Finance Corporation, was organized by Landau to take over this foreign exchange business. Its cash capital was

$50,000. It also took over the capital stock of the steamship corporation, stated to have a book value of $200,000, but the steamship company lost $153,000 in August. In August the finance corporation bought about 20,000,-000 marks, buyer's option October at 2.07, and entered into other heavy speculative foreign exchange transactions. Marks in October ranged from 1.29 to 1.65. To reduce this heavy loss Pacat endeavored to average, and bought 76,000,000 marks for December account at 1.40 to 1.45. Its 96,000,000 marks thus averaged about 1.63, or .18 above the market, showing a loss of about $172,000. On November 8th marks dropped to 1.10, showing Pacat a paper loss of about $1,000,000. They recovered to 1.55 in November, and dropped again in one day to 1.46. In December they fluctuated between 1.25 and 1.45.

This narrative sufficiently discloses the enormous losses, and corroborates the direct proof of insolvency. The balance sheet prepared by certified public accountants, Messrs. Price, Waterhouse & Co., as of December 18, 1920, shows that the liabilities exceeded the book assets by over $206,162.53 (eliminating capital stock as a liability), and on this balance sheet the investment in and advances to the Pacat Steamship Corporation are treated as worth 100 cents on the dollar. As a matter of fact the steamship corporation assets were worth much less, so that it is apparent the bankrupt was insolvent to the extent of well over $200,000. The bankruptcy occurred on December 30, 1920. The schedules show an excess of liabilities over assets of $197,000, and exclusive of the steamship company item show an insolvency to the extent of approximately $550,000.

Without entering into a detailed analysis of the value of the steamship company asset, it suffices to say that its stock was certainly of no value, that it was adjudicated a bankrupt on the 5th of February, 1921, and that its schedules show on their face that its obligations could in no event yield more than 50 cents on the dollar. Landau must have known that his company was insolvent, and his conduct gave every evidence that he did know. On December 23d he knew that he had a loss of 35 points on his enormous transaction in marks, and substantially the same situation continued from December 23d to December 31st. He testified that this one transaction showed a potential loss of some $360,000 as against his original capital of $250,000 (assuming that the steamship item was worth $200,000 at which it was carried). He admits that at one time his foreign exchange transactions showed a loss of $1,000,000 on November 8th. Indeed, in essence, his only answer to the charge that he knew he was insolvent is that he had a reasonable hope that the mark would rise and thus restore him to solvency. The deficit was so large that it is incredible that he did not know of its existence, particularly in the light of his admission that he knew of his losses.

The vice president of the company, Alfred Landau, told the witness Krassny, immediately after Christmas, in London, that the company was in trouble. Indeed, on the night of the 27th of December, the evening before he accepted Shawmut's check for $185,592.50, Kirk Landau had consulted counsel as to the advisability of a receivership and was discussing the comparative advantage of various kinds of receiverships. To this must be added the important circumstance that, when he accepted Shawmut's check on the 28th of December, he knew that he had not yet sent the cables to accomplish the franc and lire payments which he was obligated to make on the 23d of December. He took the check on December 28th with the full knowledge that he had been unable to make the payments, which were the concurrent conditions for the payments made to him by Shawmut on December 23d in connection with the franc and lire transactions.

It is suggested by the counsel for the trustee that mere knowledge of insolvency is not sufficient to warrant the inference of intent to defraud, and he cites cases where a purchaser, knowing himself to be insolvent, buys goods on credit with the possible or reasonable expectation of rehabilitating himself during the period of credit. But those cases can have no application here, where there was no period of credit. The payments in foreign currency to be made by Pacat were supposed to be made concurrently with the payments of dollars to Pacat. There could be thus no intervening period during which hope or reasonable expectation could operate to negative the inference of

fraud. The plain fact is that Landau was in a desperate situation, that he knew it, that he took these payments knowing it, and that the only excuse assigned for this conduct was the traditional Micawber hope that something would turn up.

Here the trustee must be held to stand in the same position as Pacat Finance Corporation would have stood, had there been no bankruptcy. Shawmut has a right of rescission, based not only upon the specific fraudulent misrepresentations heretofore related, but also upon an actual intent to defraud arising from the insolvency of the Pacat Finance Corporation, the knowledge of this insolvency by its officers, and the acts of patent bad faith committed by them during these last days of December. For purposes of tracing and marshaling, therefore, I find that the National Shawmut Bank of Boston is entitled to reclaim each of the three sums paid by it, namely, $58,627.50 paid on December 22, 1920, $118,890 paid on December 23, 1920, and $185,952.50 paid on December 28, 1920.

### Claim of Imbrie & Co.

On December 20, 1920, Imbrie & Co. agreed to pay Pacat $17,052.50; on December 23, 1920, Pacat agreed to pay Imbrie in Genoa on the same day 500,000 lire. The confirmation from Pacat (Claimant's Exhibit 3) and the invoice bearing the phrase "Payable here and abroad on December 23, 1920," are in exactly the form of the corresponding documents in the Shawmut transaction. Imbrie's confirmation to Pacat (Exhibit 2), dated December 20, 1920, contains the phrase "Payable Genoa-New York on Dec. 23/20." By exactly similar documents, also, Pacat agreed to pay Imbrie in Berlin 1,000,000 marks on December 28, 1920, and Imbrie & Co. agreed to pay to Pacat therefore $13,852.50 on the same day. Imbrie & Co. made the required payments; Pacat did not.

This claim is in all respects identical with the Shawmut claim, excepting that there is no evidence of specific fraudulent misrepresentations made to Imbrie & Co., either directly or through the medium of Bradstreet's. The proof of fraudulent intent arising from insolvency, however, and the knowledge thereof under the circumstances set forth in considering the Shawmut claim, apply fully here. I allow for tracing and marshaling the claim of Imbrie & Co. for $13,852.50 paid on December 28, 1920, and for $17,052.50 paid on December 23, 1920.

### Claim of Isidor Stern.

The testimony as to this claim is exceedingly meager and unsatisfactory. It sufficiently appears from the briefs of counsel, however, that the transaction differed entirely from those heretofore considered. On November 24, 1920, Mr. Stern paid to the Pacat Finance Corporation $3,200, and received therefor a check drawn on its Austrian bank. There is no evidence of this in the record, but the claimant's brief recites. "The bankrupt, as evidence of its promise, issued to the claimant its check drawn on the Austrian bank," and a statement to the same effect appears in the trustee's brief.

This transaction seems to me therefore to be simply a payment by Mr. Stern to Pacat in return for Pacat's draft on Austria. There were no concurrent conditions. There is no proof of insolvency on the date of the payment, and no claim is made in the claimant's brief of rescission on the ground of fraud. Under the authority of the Bolognesi Case, therefore, I disallow this claim.

### Claim of Leonard Pasqualicchio.

On December 20, 1920, Pasqualicchio purchased from Pacat a draft for 50,000 lire, and on December 20, 1920, he purchased a draft for 100,000 lire, for which he paid the bankrupt $5,750. There were no concurrent conditions, and in so far as the nature of the transaction itself is concerned, this claim is governed by the Bolognesi case. On the date of the purchase of these drafts the bankrupt was insolvent, and I find a sufficient intent to defraud to sustain these claims for tracing and marshaling upon that ground.

### Claim of Alexander Von Fest.

On December 23, 1920, Von Fest agreed with the Pacat Finance Corporation to pay to it $22,955 in New York on December 28, 1920; Pacat agreed to pay on the same day at Prague 2,000,000 Czecho-Slovakian kronen. The transaction was evidenced by a confirmation similar to the one employed in the Shawmut case, but no invoice containing the words "payable here and abroad" was offered in evidence. The transactions, however, clearly occurred at a time and under conditions which justify the allowance of this claim on the ground of insolvency and fraudulent intent. The claim is therefore allowed for tracing and marshaling.

It additionally appears, however, that the claimant is indebted to the bankrupt estate on entirely independent transactions in the sum of $3,055.13. The trustee asserts that this indebtedness should be offset. On principle the claimant's right to retake these specific moneys seems to me not a debt against which other debts can be offset. I have admitted in evidence proof of this debt from Von Fest to Pacat, so that the record may give the District Court the basis for appropriate modification of this holding in the event the court should take a different view of this question of law.

### Claim of Morris Shulman.

On December 24, 1920, the Federal Trust Company of Newark, acting for Morris Shulman, sent its draft for $300 to the bankrupt, inclosed in a letter which stated that the remittance was made "to cable the equivalent in Polish marks" to a named payee in Warsaw. The letter requested that a bill for the cable charges be sent. The bankrupt acknowledged this with its form of invoice heretofore described, which stated that the amount involved, $303.60, was "payable here and abroad on immediately." As to this transaction I hold:

First. That the language of the letter of December 24, 1920, is substantially analogous with the hypothetical case described by Judge Crane in the Legniti Case as a "direction to a bank or other person to transmit a certain specific sum of money to a person abroad." Ryan v. Phillips, 3 Kan. App. 704, 44 Pac. 909; Legniti v. Mechanics' & Metals Nat. Bank, 230 N. Y. 415, 130 N. E. 597, 16 A. L. R. 185; Musco v. United Surety Co., 132 App. Div. 300, 117 N. Y. Supp. 21; People ex rel. Zotti v. Flynn, 135 App. Div. 276, 120 N. Y. Supp. 511; St. Louis v. Johnson, Fed. Cas. No. 12,235; Cutler v. Amer. Ex. Nat. Bank, 113 N. Y. 593, 21 N. E. 710, 4 L. R. A. 328.

Second. That in view of the form of the invoice it was clearly understood that the receipt of the $300 was conditioned on the immediate payment of the marks in Warsaw.

Third. That in any event the claimant must have the benefit of rescission for fraud arising from insolvency and the surrounding circumstances heretofore discussed. I therefore allow for tracing and marshaling this claim for $300 paid on December 24, 1920.

### Claim of Washington Loan & Trust Company.

In December, 1920, the Washington Loan & Trust Company, of Washington, D. C., bought of Pacat two drafts, for 25,000 francs each, for which it paid Pacat the sum of $2,932.50. The drafts were drawn upon a Paris bank. On January 3, 1921, the receiver gave to the Washington Loan & Trust Company actual notice of the bankruptcy. On February 3, 1921, after such notice, the Washington Loan & Trust Company caused an attachment to be levied in France on the funds standing to the credit of the bankrupt with the Paris bank. Subsequently a stipulation was made between the claimant and the receiver that the attachment should be raised and the moneys remitted to the receiver, and "that the Washington Loan & Trust Company reserves all its rights as a lienor against said funds, and that the question of the validity of the attachment above referred to and heretofore obtained in Paris may be determined by a court of competent jurisdiction."

The question here is whether the claimant, an American corporation, could validly secure a preference by the levying, after bankruptcy and with knowledge thereof, of an attachment in a foreign country. The question appears

295 F.—26

to be novel. No authority squarely in point is cited by either counsel. Some guidance is furnished by two cases.

In Orinoco Iron Co. v. Metzel, 230 Fed. 40, 144 C. C. A. 338, the federal government had received certain moneys from the government of Venezuela in settlement of the cancellation of a concession owned by the Orinoco Iron Company. There were conflicting claims to these moneys in the hands of the government, asserted by the trustee in bankruptcy and by the bankrupt corporation. Writing for the Circuit Court of Appeals, for the Sixth Circuit, Judge Knappen says: "True, the bankruptcy court may not enforce its process or its orders outside the limits of its territorial jurisdiction; * * * but, having the proper parties before it, it can within its own district make necessary orders to protect its jurisdiction. * * * In such case the power exists to compel a defendant to do all things necessary which he could do voluntarily to give full effect to the decree against him. Obedience to the decrees so made is enforced by means of process against the person."

In Re Pollmann, 156 Fed. 221, the United States District Court for the Southern District of New York held that a German creditor, residing in Germany, who had secured an attachment against German property of the bankrupt, could not prove his claim in the bankruptcy court. Judge Hough writes: "If Klemm, a resident of Germany, may enjoy in the United States the advantages of legal proceedings valid in Germany, such advantage cannot logically be confined to foreigners; for the advantage asserted does not depend upon the person of the creditor, but upon the law of the situs of the property, and American creditors of American bankrupts might be actuated by early suspicion to attach their debtors' foreign estates, and enjoy the proceeds of such legal proceedings, to the destruction of equality."

I recognize fully that this case does not go to the length of actually holding that an American creditor could not so attach, but holds only that he could not so attach and then prove his claim for a deficiency. None the less, these cases, read in the light of such fundamental authorities as Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405, and Acme Harvester Co. v. Beekman Lumber Co., 222 U. S. 300, 32 Sup. Ct. 96, 56 L. Ed. 208, indicate that the claim of the Washington Loan & Trust Company is in direct conflict with the basic principles of bankruptcy law. To sustain this view, it is not necessary to hold that actual legal title to the credit in the French bank was vested in the receiver and trustee. It is sufficient that all parties are within the jurisdiction of the laws of this country. The preference sought to be obtained by the Washington Loan & Trust Company is entirely analogous with any other voidable preference, and may thus be vacated by force of the provisions of the Bankruptcy Act, when the parties have subjected themselves to the jurisdiction of the court. Any other holding would cause a mad scramble in every bankruptcy proceeding, where the bankrupt owned property in foreign jurisdictions, and create situations wholly repugnant to that equality which the courts declare is the primary object of the Bankruptcy Act (Comp. St. §§ 9585–9656). For these reasons I disallow the claim of the Washington Loan & Trust Company.

### Claim of Josephthal & Co.

On December 28, 1920, Josephthal & Co. paid to Pacat Finance Corporation $3.471.25 and $6,902.50 in payment, respectively, for 250,000 marks and 500,000 marks, which were to be paid on the same day. Payments were made pursuant to agreements made on December 22 and 23, 1920, respectively, which are in all substantial respects identical with the transactions in the Shawmut case. The same considerations control, and I allow for tracing and marshaling the claim for these two sums.

### Claim of Joseph Brecher.

The claimant here paid moneys on October 13, 14, and 16, 1920, to Pacat aggregating $2,590, for which he received drafts drawn upon foreign correspondents in foreign currency. These were ordinary draft transactions, and because of their dates were unaffected by the consideration of insolvency. I therefore disallow the claim.

### Claim of Ernest Grunsfeld.

This claimant on December 4 and 6, 1920, paid to Pacat sums aggregating $2,700, for which he received drafts drawn on German banks for marks. This claim is in all respects similar to the Brecher claim, and must be disallowed.

### Claim of W. W. Lanahan & Co.

#### (a) Claim on Bonds.

On December 23, 1920, a transaction was had between Pacat and W. W. Lanahan & Co., of Baltimore, evidenced by the following writings: On December 23, 1920, Pacat wrote to Lanahan: "This is to confirm that we have purchased from you to-day * * * Fcs. 50,000, 5% French government Victory Loan bonds at 49.50 for delivery prompt." An identical letter was written by Pacat to Lanahan, confirming the purchase of "Lire 150,000 Sixth Italian War Loan bonds at 26.25." On December 24th, Lanahan wrote to Pacat: "We beg to confirm sale to you of" the bonds in question at the price in question.

Thereafter, on December 24, 1920, Lanahan wrote to Pacat, stating that they were shipping these bonds, and adding: "We are inclosing bill for these bonds and would thank you to deposit the amount of the bill with the National City Bank for our account advising us accordingly." The bonds were sent with the letter, were received and sold by Pacat, and the proceeds on December 28th deposited in Pacat's account in the National Park Bank. Pacat never paid the purchase price of the bonds to Lanahan, and Lanahan asserts the right to follow the proceeds of the bonds. They contend that the transaction, evidenced by these writings, was a "C. O. D." one, and seek to sustain this contention by the authority of In re Perpall, 256 Fed. 758, 168 C. C. A. 104.

The Perpall Case in turn relies on Empire State Type Founding Co. v. Grant, 114 N. Y. 40, 21 N. E. 49. The following excerpt from the opinion of Judge Parker in that case is controlling: "The agreement, however, did not provide, in express terms, that payment should be made on delivery. Neither did it provide that payment and delivery should not be concurrent. The rule in such case is that the intent of the parties must control. If it can be inferred from the acts of the parties and the circumstances surrounding the transaction that it was the intent that delivery and payment should be concurrent acts, the title will be deemed to have remained in the vendor until the condition of payment is complied with. * * * The question of intent is one of fact, not of law."

In the Perpall Case evidence of custom and certain other evidence was given, from which it was inferred as a fact that the intent of the parties was to make payment and delivery concurrent conditions. The burden of proof on this issue is clearly with the claimant, and in the instant case no proof whatever has been given by the claimant other than the writings. From the writings alone I can see no way of drawing an inference of fact that it was the intention of the parties to make the transaction a cash one. Nevertheless, it was obviously the intention of the parties that payment should be promptly made, and the claimants assert as a second basis for their claim their right to rescind by reason of the fraudulent intent of Pacat.

Pacat received these bonds on December 23, 1920, at a time when it was insolvent and knew it was insolvent, and when it knew that a prompt payment was expected. It proceeded within a few days to sell the bonds and deposited the proceeds in its bank account, and while it may well be that Mr. Landau intended or rather hoped if his affairs took a favorable turn to pay for these bonds, I think it is fairly to be found as a fact that he did not, under conditions as they then existed on December 23, 1920, intend to pay for these bonds. On the basis of insolvency and the surrounding circumstances, therefore, I find such fraudulent intent on the part of the Pacat Finance Corporation existed as to justify the claimants in rescinding and following the proceeds of the bonds, namely $6,412.50, deposited in the National Park Bank on December 28, 1920, and I allow such claim for the purposes of tracing and marshaling.

### (b) Foreign Exchange Transaction.

There were five foreign exchange transactions (in none of which did the claimants receive either their dollars or their foreign currency), three of which were cable transfers identical in all respects with those described in the Shawmut case. On these three transactions, $3,487.50, $3,502.50, and $1,387.50 were paid to the bankrupt by Lanahan & Co. on December 20, 23, and 24, 1920, respectively, and this claim I allow for tracing and marshaling both on the theory of concurrent conditions and of fraud. The two other transactions were purchases of checks and drafts on foreign banks as follows: On December 16, 1920, $3,350 was paid to the bankrupt for the purchase of a draft in marks; and on December 22, 1920, $3,370 was paid for the purchase of a draft in lire.

The transaction of December 22, 1920, was clearly affected by the same considerations of fraud arising from insolvency and the surrounding circumstances as were considered in the Shawmut case. As to the transaction of December 15th, the sole question that arises is whether I should relate the proof of insolvency as of December 18th back to December 15th. I think this inference of fact should be drawn and therefore allow this claim also.

### Claim of Zimmerman & Forshay.

On October 21, 1920, Zimmerman & Forshay paid to the bankrupt $14,502.50 in return for the engagement of the bankrupt to pay in Vienna to the order of Zimmerman & Forshay 5,000,000 inland kronen. The claimants do not seek rescission and do not claim to follow their dollars, but, on the contrary, assert a claim to impress a lien on the proceeds of the inland kronen held in the bank account of the bankrupt's agent in Vienna. No consideration of fraud or concurrent conditions therefore is relevant to this claim.

It appears that there was a regulation or law in Austria making it illegal to place inland kronen to the credit of a foreigner, and on October 30th Pacat advised Zimmerman & Forshay to this effect, stated that they had therefore been unable to make the payment as directed by Zimmerman & Forshay, and requested them to name a resident of Austria to whom the payment might be made for their account. At this time Pacat had standing to its credit in Vienna with the Guttenberg Bank a sum of money exceeding 5,000,000 inland kronen, which stood nominally to the credit of Emil Hoenig, an Austrian, who was the agent of the Pacat Finance Corporation.

After the sending of the letter of October 30th, a conference occurred between Mr. De Wald, representing Zimmerman & Forshay, and Kirk A. Landau, representing Pacat. De Wald insisted that he was entitled to the return of his dollars; Landau insisted that he would not give the dollars back, but would only pay the kronen, and that it was De Wald's duty to name an Austrian resident to whom the payment might be made. There was some further conversation as to referring the matter to arbitration, which does not appear to have ripened into an agreement to arbitrate. De Wald also testifies in part: "I asked him where our kronen was now. 'They are held for you,' he told me, either in (naming certain banks) in Vienna in trust. I told him we can't accept such a proposition."

De Wald further testifies that Landau said that while they were trying to settle the dispute the kronen would be held in trust over there. Another answer of De Wald's is as follows: "Q. You said to Mr. Kohlman that what Mr. Landau said was they were holding 5,000,000 inland kronen for your account? That is right? A. No; that they were holding 5,000,000 kronen with a bank over there in trust for us, so that at any time we would want to dispose of it we could designate what individual over there to make payments as we designate."

Landau, on the other hand, denies that he said that the kronen were to be held in trust for Zimmerman & Forshay, and states in substance that he told him merely that the kronen were being held in Vienna with the firm of Guttenberg & Co. to the credit of Emil Hoenig.

The claimant lays great stress on the use of the words "in trust," according to Mr. De Wald's testimony. I have no doubt that Mr. De Wald's intent was to give this conversation as he recalled it, and I do not for a moment suggest

that he intentionally gave incorrect testimony. Reading all the testimony on this point together, however, I am convinced that there was nothing said which amounted to a declaration of trust by Landau. It is clear that De Wald was primarily interested in getting his dollars back, and Landau primarily interested in asserting that there were sufficient kronen in Vienna to meet their obligation, and that they were going to meet it in kronen, and in no other way. De Wald, in turn, repudiated this suggestion. It is most improbable that Landau, posing as a solvent banker, would have deemed it necessary or prudent to suggest that Pacat was holding these funds in trust, and I find as a fact that there was no declaration of a trust of these kronen.

It is pertinent here, however, to consider a point urged by this and several other claimants, namely, that the debtor and creditor relationship is converted into a trust relationship merely by the fact of instruction to pay given by Pacat. For support of this contention I am referred chiefly to the exceedingly illuminating article on this subject written by Dean Stone of the Columbia Law School in the Columbia Law Review of June, 1921, at page 507, and referred to by the Court of Appeals in Equitable Trust Co. v. Keene, 232 N. Y. 290, 133 N. E. 894, 19 A. L. R. 1137, as a "very thorough and well-considered discussion of the general subject of foreign exchange." There Dean Stone writes: "In the Legniti Case the banker failed before he had taken any steps to procure the credit pursuant to his contractual obligation. Had he actually acquired the credit, and specifically appropriated it, or a part of it, to his undertaking for account of the plaintiff, a very different situation would have arisen, and one on which the plaintiff might properly have based a claim that the credit, so far as it was an enforceable one, was held by the banker in a fiduciary capacity for the plaintiff. This was the holding in Farley v. Turner."

I do not believe that a mere advice by Pacat to its foreign correspondent to pay could possibly be the "appropriation" to which Dean Stone refers in this article. A consideration of Farley v. Turner, 26 Law J. Ch. 710, in connection with its companion case, In re Barnards Banking Co., Massey's Case, 39 Law J. Ch. 635, makes it clear that more is required to constitute appropriation. The later case, In re Barnards Banking Co., is thus distinguished by the Master of the Rolls from Farley v. Turner: "There the country bank had applied the money and the town agent had received it for the specific purpose."

Here there was no application of the money. In other words, the proof in Farley v. Turner was that the bank, which corresponds with the Austrian bank in this case, had appropriated the money to the use of the original payor, corresponding here with Zimmerman & Forshay. To hold that a mere advice from a New York bank to a foreign bank operated to impress a trust on the balance in the foreign bank to the credit of the New York bank in favor of a customer of the New York bank would be to create inextricable confusion. The foreign bank would be compelled continuously to set up a series of trust funds, and thus create a condition entirely inconsistent with the existence of an account current, which is a requisite to the conduct of business and in accord with the intent of business men. I do not think, therefore, that a trust can be asserted merely on the ground that an advice to pay was given by Pacat to the Austrian bank. For these reasons I disallow the claim of Zimmerman & Forshay.

### Claim of East River National Bank.

This claimant seeks to impress a lien on the lire credit in the Credito Italiano and does not seek rescission. On December 6, 1920, it was agreed between the claimant and Pacat that on December 8th the claimant would pay $8,825 here, and the bankrupt would pay in Genoa 750,000 lire. The dollars were paid in New York; only 500,000 of the lire were paid in Genoa, and a claim against this fund for the remaining 250,000 lire is asserted. On December 8, 1920, Pacat sent the following cable to Credito Italiano in Genoa: "You will receive for our account from Empire Trust Company December eleventh one million lire from Banco D'Italia, Genoa, by order of Italian Institute one million lire value December eleventh. Pay to M. Berardini State Bank Naples five hundred thousand lire credit the account of American Foreign Banking Corporation five hundred thousand lire credit the Account of East River

National Bank five hundred thousand lire credit the account of Park Union Bank two hundred fifty thousand lire."

The testimony shows that the order in the cable to pay 500,000 lire to the credit of the East River National Bank was a mistake, and that it should have read 750,000 lire. The claimant's brief proceeds on the theory that Italian lire are to be treated legally as merchandise; that there was thus in effect a sale of merchandise and that title to the lire was passed to the various persons designated in the cable of December 8th, so that they may share in the fund remaining in the Credito Italiano. I think this contention is fallacious. There was in no legal sense a sale of lire. There was an engagement to pay an amount of lire on December 8, 1920. It is difficult to found a claim that the legal or equitable title to the remaining 250,000 lire passed by reason of this cable, when the cable does not refer to this 250,000 lire. Further, I cannot read this cable as an appropriation of the particular moneys, therein described as to be received for the credit of Pacat, to the payment of the sums therein ordered to be paid for account of Pacat. The evidence shows that Pacat had an account current running with the Credito Italiano. What this cable orders is nothing more than a credit to the account current of moneys to be received and a debit to the account current of moneys to be paid out. The same considerations which affect my decision in the Zimmerman & Forshay Case control here and the claim must be disallowed.

### Claim of M. Berardini State Bank:

This claimant also seeks to impress a lien on the lire credit in the Credito Italiano and does not seek rescission. On December 14, 1920, claimant paid Pacat $8,875, and on December 15th paid Pacat $17,500, in payment for cable transfers, respectively, of 250,000 lire and 500,000 lire. At the same time there was in force an engagement of the bankrupt, for which claimant had already paid, to transfer an additional 750,000 lire. In point of fact, payment of only one of these sums of 750,000 lire was made. The claimant relies on the cablegram of December 13th, quoted above in connection with the claim of East River National Bank and also upon another cable dated December 17, 1920, reading as follows:

"December 17th, 1920.

"1602 Credit Genoa. 318 Dec. 17th refer to our cablegram of the 13th test word 355 repeat Beyfewoaip Ayuir stop you will receive for our account from Banssconto one million Lire by order of Givennah London you will receive for our account from Banco di Roma for account of New York office one million Lire you will receive for our account from Bansconto by order of New York office one million two hundred fifty thousand Lire stop pay to M. Berardini Naples for account of New York office seven hundred fifty thousand Value Dec. 29th pay 100,000 to Banca Commerciale Italiana for account of Lanahan.

"Pacatfin,"

—and a third cable dated December 27, 1920, reading as follows:

"December 27, 1920.

"1679 Genoa Credit. Dec. 27th Refer to my cablegram of 13th and December 17th in each which we requested you to pay Berardini Naples seven hundred fifty thousand total one million five hundred thousand Confirm by wire to us that these payments all made.	Pacatfin."

A transcript from the books of Credito Italiano of its account with Pacat contains three entries of debit:

Dec. 18, 1920.  Naples acct. Berardini.......................... 500,000
Dec. 21, 1920.  Paid Berardini ................................. 250,000
Dec. 28, 1920.  Credited Naples Berardini ...................... 750,000

It appears from Claimant's Exhibit 11 that the Credito Italiano had a Naples office, and that beginning with the month of November, 1920, a large number of transactions, involving engagements or payments of 500,000 lire, 250,000 lire, and 750,000 lire by the Naples branch for account of Pacat. It appears, also, that the Naples branch refused to pay the last 750,000 lire for

Berardini, because it had orders for payments exceeding the amount at Pacat's disposal.

The record as to the significance of these book entries is in exceedingly unsatisfactory shape. It is impossible to state whether the entries quoted refer to the unpaid 750,000 lire, to the particular 750,000 lire paid pursuant to the transactions here in question, or to some of the transactions antedating those here in question. The burden on this point is clearly on this claimant. I can give no force to these entries because of this failure to connect them with the particular transaction here in question. But, even assuming that the entry of December 28th related to the transaction here in question, it represented nothing more than an instruction to transfer by Credito Italiano, Genoa branch, to its Naples branch, for account of Berardini, and it appears clearly from Exhibit 11 that the Naples branch refused to appropriate this credit in this way because of overdrafts. There was no appropriation in a legal sense by Credito Italiano to Berardini, and, because of the considerations governing my decision in the Zimmerman & Forshay case, I disallow this claim.

### Claim of Vincent J. Scotto.

The claimant paid the bankrupt $1,690 on December 22, 1920, for a draft on Italy. The draft was purchased on December 22, 1920, but not paid for until some days later. The check for $1,690 was deposited in the Park Bank on December 29, 1920. The trustee properly asserts that this claim will stand or fall with the finding as to insolvency and intent of Pacat on December 22, 1920. By reason of the findings on these subjects already indicated by me, the claim must be allowed for tracing and marshaling.

### Claim of West Side Trust Company.

On December 23, 1920, the West Side Trust Company and the bankrupt entered into an agreement for the payment of $1,388.60 to the bankrupt on December 28, 1920, and the payment of 100,000 marks in Berlin on that day for account of the West Side Trust Company. The transaction was evidenced by instruments substantially identical with those in the Shawmut case. The West Side Trust Company received neither the marks nor the return of its dollars, and the claim must be allowed for $1,388.60 as of December 28, 1920, for the purposes of tracing and marshaling.

### Claim of British Bank for Foreign Trade.

On December 4, 1920, a contract was made between the British Bank for Foreign Trade, Limited, and Pacat for the payment "here and abroad" on December 7, 1920, of $28,000 by the British Bank for Foreign Trade and 2,000,000 marks in Berlin by Pacat. The British Bank paid the $28,000, but did not receive the marks or the return of its dollars. Proof of insolvency and fraud is not relevant to this claim, as it cannot be related back to so early a date as the 7th of December, 1920. The transaction, however, was evidenced by documents substantially identical with those in the Shawmut case in providing that the money should be "payable here and abroad" on December 7, 1920. On the ground, therefore, that payment here and abroad were concurrent conditions, I allow this claim for tracing and marshaling.

### Claim of Beckley National Bank.

This claim was heard before me, and involved the recovery of money paid to the receiver himself. The payment has since been made by the receiver, and the claim is therefore withdrawn.

### Claim of Kemerer & Co.

The petition remitted to me in this matter is an ordinary proof of unsecured claim in bankruptcy, and on its face presents no claim, which, under the terms of the order conferring authority upon me, I have any right to deter-

mine. The claim is therefore dismissed without prejudice to the rights of the claimants as unsecured creditors.

### Claim of Raabe, Glissman & Co.

The presentation of the evidence on this claim was not concluded, and counsel for the claimant states that he does not intend to offer further testimony. No case was made out in the fragmentary testimony offered, and the claim is disallowed.

### Claim of C. B. Richards & Co.

The hearing on this claim is at this time not concluded by reason of the circumstance that a commission has been issued to take testimony abroad. The claimant, however, has already received payment of his claim under order of the court, and, if the claim is disallowed, claimant will be required by order of the court to return the money, and can in no event receive any further money. The ultimate allowance or disallowance of this claim, therefore, will not affect any question of tracing or marshaling, and I respectfully suggest to the court that the order made herein should continue the power of the special master until this claim is disposed of. The report is made in this form to obviate the imposition of further delay on the claimants.

### Marshaling.

The first fund to be divided is the sum of $240,414.46 made up as follows:

| | |
|---|---|
| Amount on deposit in National Park Bank, New York, December 30, 1920 | $198,589.46 |
| Cash recovered by the receiver after bankruptcy from Krassny | 5,000.00 |
| Dollar value of 1,000,000 lire, being part of balance in the Credito Italiano transferred by the receiver to the credit of the National Park Bank account and originating in payments made by claimants whose checks were deposited in the National Park Bank on December 28, 1920 | 36,825.00 |
| Total | $240,414.46 |

I shall proceed to marshal this fund on the legal principle that the last money to be paid into the fund is the first money to be paid out of it. Out of this fund there is first to be allowed to the claimant Morris Shulman the sum of $300, all interested counsel having consented to this disposition. By stipulation of counsel there is to be added to all claims, in lieu of interest, a flat 2½ per cent., which is less than the interest earned on the fund, so that the claimant Morris Shulman is entitled to recover the sum of $300, plus the sum of $7.50 in lieu of interest, making a total of $307.50.

The claimant Vincent Scotto has had his claim allowed as of December 29, 1920, in the sum of $1,690. He is therefore entitled to this sum, plus 2½ per cent. thereof, being $42.50, making a total of $1,732.25.

The next claimants entitled to share this fund are those whose checks were deposited on December 28, 1920. These claimants and the percentages in which they are entitled to share, together with the amount of such percentages figured on the basis of the fund of $240,414.46, are as follows:

| | | |
|---|---|---|
| West Side Trust Co. | .57634 per cent. | $ 1,374.14 |
| Josephthal & Co. | 4.30562 | 10,265.65 |
| Alex Von Fest. | 9.52747 | 22,715.82 |
| National Shawmut Bank. | 77.17958 | 184,015.00 |
| Lanahan & Co. | 2.66151 | 6,345.69 |
| Imbrie & Co. | 5.74948 | 13,708.16 |
| Total | 100.00000 per cent. | $238,424.46 |

These allowances exhaust the fund. In the foregoing statement I have not added the 2½ per cent. in lieu of interest, but shall add that to the total allowed to each claimant as hereinafter set forth.

The next fund to be divided is the sum of $22,743.41, made up as follows:

Value of francs transferred to New York accounts by the receiver, being the proceeds of checks of the National Shawmut Bank, Lanahan & Co., and Imbrie & Co. on December 23, 1920 $ 9,408.04

Value of 1,073,589.40 marks transferred to New York by the receiver and being originally the proceeds of checks of the same claimants deposited in the account of the Pacat Finance Corporation in the National Park Bank on December 23, 1920   13,335.37

                                                                    $22,743.41

This sum of $22,743.41 is therefore part of the direct proceeds of payments made by these three reclaimants on December 23, 1920, and no other moneys of other reclaimants in any way entered into these funds. These claimants, therefore, alone are entitled to share this fund, which is directly traced as the proceeds of payments made by them. The proportions in which they are entitled to share and the principal sum resulting from these percentages are as follows:

National Shawmut Bank.................. 85.25942 per cent. $19,390.90
Lanahan & Co. ..........................  2.51174              571.26
Imbrie & Co. .......................... 12.22884            2,781.25

    Total ..........................100.00000 per cent. $22,743.41

These allowances exhaust this fund. I therefore advise a decree directing the trustee to make the following payments:

To Morris Shulman:
    Principal ...................................$  300.00
    Interest ...................................     7.50  $   307.50

To Vincent Scotto:
    Principal ...............................  1,690.00
    Interest ...............................     42.25         1,732.25

To Imbrie & Co.:
    Principal ............................... 16,489.41
    Interest ...............................    412.24        16,901.65

To Lanahan & Co.:
    Principal ...............................  6,916.95
    Interest ...............................    172.92         7,089.87

To National Shawmut Bank of Boston:
    Principal ............................... 203,405.90
    Interest ...............................   5,085.15       208,491.05

To Alex Von Fest:
    Principal ............................... 22,715.82
    Interest ...............................    567.90        23,283.72

To Josephthal & Co.:
    Principal ............................... 10,265.65
    Interest ...............................    256.64        10,522.29

To West Side Trust Company:
    Principal ...............................  1,374.14
    Interest ...............................     34.35         1,408.49

In addition the trustee should be directed to pay the amount of interest actually earned by him on these respective amounts from the date of this report to the date of the actual payment to the respective claimants.

Francis L. Kohlman, of New York City, for trustee.

Hays, Hershfield & Wolf, of New York City (Edwin D. Hays, of New York City, of counsel), for National Shawmut Bank of Boston.

A. J. Steelman, of Newark, N. J., for Morris Shulman.

Blandy, Mooney & Shipman, of New York City (Richard J. Mackey and Charles T. B. Rowe, both of New York City, of counsel), for M. Berardini State Bank.

Rabenold & Scribner, of New York City (Ralph M. Ketcham, of New York City, of counsel), for Imbrie & Co.

Foley & Martin, of New York City (Wm. Shea, of New York City, of counsel), for Vincent Scotto.

Goldman & Unger, of New York City (Samuel Rubin, of New York City, of counsel), for Josephthal & Co.

White & Case, of New York City (Paul G. Pennoyer, of New York City, of counsel), for West Side Trust Co. and Lanahan & Co.

John J. Curtin, of New York City, for East River Nat. Bank.

KNOX, District Judge. The various claims passed upon by the special master will be disposed of in the order in which he treated them:

Claim of National Shawmut Bank of Boston:

[1, 2] For the reasons specified by the master in dealing with the reclamation of Shawmut, I shall confirm the report thereon. As was said by Mr. Chief Justice Hiscock in Equitable Trust Co. v. Keene, 232 N. Y. 290, 133 N. E. 894, 19 A. L. R. 1137:

"The fact that the [exchange] transaction is to be effectuated by cable is of course immaterial; the principles defining the nature of the transaction are not any different than they would be if the transaction was to be accomplished by letter or special messenger. The cable gives needed speed to the operation but does not change its nature."

What Pacat undertook to do for Shawmut was that it would make available to the latter at a specified time and place a specified amount of foreign exchange. There was the further engagement between the parties that, upon the day the exchange was made available to Shawmut, the consideration for the service should be paid to Pacat. In this sense, therefore, the matter was a cash transaction, and did not involve the extension of credit as between Pacat and Shawmut. Performance by one party was conditional upon performance by the other, and default by the latter would prevent title to the money or the exchange, as the case might be, from passing to him.

[3] The nature of the transaction makes it impossible that performance by the parties should be exactly simultaneous. Not only the means of communication necessary to be employed, but differences in time between the points where the respective parties were to perform, would occasion some difference in the hour and minute of performance. But, if the law is to deal with practicalities rather than technicalities, I fail to see why the situation should be otherwise than it would have been had the transaction been consummated by special messenger, as was the case upon dissimilar facts, but upon a similar principle, in Matter of Perpall, 256 Fed. 758, 168 C. C. A. 104. Up-

on the authority of that decision, and others of a like nature, the master's report upon the Shawmut claim will be confirmed. The claim is also sustained upon the ground of the bankrupt's fraud, which is the subject of discussion by the master.

Claim of Imbrie & Co.:

The facts upon which this claim is founded are substantially identical with those present in the Shawmut claim. The ruling there made will support the master's finding, and the same is confirmed.

Claim of Isidor Stern:

[4] The facts here bring the claim squarely within the decision of our Circuit Court of Appeals in Re Bolognesi & Co., 254 Fed. 770, 166 C. C. A. 216, and by reason thereof it must be disallowed, as was done by the master.

Claim of Leonard Pasqualicchio:

This claim is also within the Bolognesi Case, supra, and, were it not for the consideration of Pacat's fraud, the law would require its disallowance. However, the date upon which the transaction was had entitles the claimant to rescission upon the ground of fraud, and for such reason the claim is allowed.

Claim of Alexander Von Fest:

[5] This claim was allowed by the master upon the basis of Pacat's insolvency and fraudulent intent. The master's finding is confirmed. The present claimant, it appears, is indebted to the bankrupt estate in the sum of $3,055.13 upon an independent transaction. The trustee in bankruptcy takes the position that this indebtedness should be offset against the claim as allowed. The master was of opinion that Von Fest's right to retake the moneys allowed him is not subject to the offset claimed by the trustee. Whatever may be the principle of law involved, it is beyond question only proper that Von Fest, if he is to have his equities recognized in this proceeding, should himself recognize those of the general creditors of Pacat. The order will provide, therefore, that Von Fest's claim, as allowed, shall be paid only as and when he discharges his indebtedness to the estate.

[6, 7] The same may be said as to Lanahan's indebtedness to the estate, unless that firm has a claim as a general creditor against the estate in excess of its indebtedness to Pacat.

Claims of Morris Shulman, Washington Loan & Trust Company, Josephthal & Co., Joseph Brecher, Ernest Grunsfield, and W. W. Lanahan & Co.:

The findings and conclusions of the master as to these claims will be confirmed, with the modification hereinbefore noted as to the Lanahan claim.

Claim of Zimmerman & Forshay:

[8, 9] Here, too, I think the master has reached the right conclusion. As I view the case, it is that, when it was ascertained by claimant and Pacat that the credit desired by the former could not be set up in the manner desired, owing to a decree of the Austrian govern-

ment, a dispute arose as to whether claimant should be reimbursed in kronen or in dollars. Kronen had fallen in value, and Zimmerman & Forshay wanted the return of the dollars they had paid to Pacat. It was proposed that the dispute be arbitrated. Meanwhile the moneys remained with Pacat, and the credit was available to claimant, had it desired to take advantage of it upon the terms and conditions provided for by the Austrian government, or as suggested by Pacat. The master has found that Pacat did not, pending the determination of the dispute, undertake to hold claimant's fund "in trust," as claimed by Zimmerman & Forshay. I shall not disturb that finding. The result is that, during the period of its negotiations with Pacat, claimant was relying upon its credit. Inasmuch as bankruptcy came about before the dispute was settled, claimant's rights are limited to those of a general creditor. The report denying claimant's right to priority is confirmed.

Claim of East River National Bank:

The master's report is confirmed.

Claim of M. Berardini State Bank:

So far as the master deals with claimant's right to recover 750,000 lire now on deposit in Credito Italiano, and to which the trustee and claimant each assert title, I am in accord with his decision; that is, I hold title in such lire not to be vested in claimant, although such was in effect the claim asserted in the petition. By reason of the text of the petition and claimant's main theory thereon, the master did not consider the question as to whether claimant is entitled upon any other theory to recover the money paid for the credits for which it contracted, even assuming its ability to trace such funds into the hands of the trustee, or into the fund in the hands of Credito Italiano; in other words, the master, in effect, assumed claimant to have waived any demand for relief, save that specifically set forth in the petition. An examination of the record upon this claim shows that the petition was filed upon April 15, 1921. Hearings thereon began December 5, 1922, and in their course a lengthy colloquy as to the nature of the claim took place between the master, attorney for the claimant, and the trustee. It started as follows:

"The Master: Now, I want to ask claimant's counsel a question: * * * Do you assert here the right to an order directing that the trustee recognize your claim to a lien on the funds in Credito Italiano in Italy? Is that the exact nature of your claim, or do you claim the right to impress a lien upon any moneys now in the National Park Bank?"

After more or less restatement of the same proposition, Mr. Mackey, of counsel for Berardini, said:

"Yes; I am presenting my proof in accordance with the words of that petition.

"The Master: Very well.

"Mr. Mackey: And in addition to that I would like to say we claim title to those funds where the credit was established for our benefit.

"The Master: Which funds?

"Mr. Mackey: The funds in Italy to which the receiver has laid claim.

"The Master: Exactly. Now I understand your claim fully, and I understand you do not take the position that your money or dollars that you paid are to be returned to you; you take the position that you are entitled to these specific lire out of the Italian funds, and that the trustee is acting inequitably in barring you from getting those lire.

"Mr. Mackey: And we also claim that, if he does not withdraw his claim, we are entitled to the dollars here. I do not want to limit myself in any way, shape, or form.

"The Master: Well, the point is that you have limited yourself in your petition. That is exactly what I want to bring to your attention. You are not, as I understand it, asserting any lien.

"Mr. Mackey: Then I would like to amend my petition."

Objection to this being made by the attorney for the trustee and by counsel for the Shawmut Bank, the master said:

"I do not think I have any power to allow you to amend the petition.
"Mr. Mackey: I make the application and take an exception."

He added:

"My desire is not to assert any different claim, but to supplement it, so as to make the prayer read in the alternative—that, in the event of the receiver being not directed to withdraw his claim, he be directed to repay in the money delivered to the Pacat Finance Corporation."

The master denied the application, suggesting, however, that if he could be shown to have authority to allow an amendment of the petition he would permit the application to be renewed, suggesting that, although he would not grant an adjournment for an application to amend to be made to the court, such application could be made without his permission. So far as appears, the petition of claimant was not amended, but at a subsequent stage of the proceedings counsel for Berardini made manifest their desire for alternative relief in the event the decision was against the claimant as to specific relief asked for in the petition. For example, Mr. Rowe, also of counsel for Berardini, said:

"I wish to state that we do not limit our claim in any respect or in any aspect: that we are asking for other or further relief, and we ask for any relief that equity or law entitles us to under our claim, of any character, and that we express no limitation of the relief to which we are entitled, so long as it is justified by the facts on the hearing. That is all."

The point of all this recital is that the exchange transactions between the claimant and Pacat were upon terms calling for "payment here and abroad upon" the same day. If it be the fact that the payments made by Berardini can be traced into funds which came or will come into the hands of the trustee, the ruling of the master, assuming claimant not to have barred itself from having such relief, should be the same as was granted upon similar facts in the Shawmut claims; that is to say, the Berardini transactions were of a cash nature in the same sense that the Shawmut transactions were of that character. In the argument before me, it was insisted that Berardini's funds can be so traced into the hands of the trustee. Under the rule of marshaling assets that must be adopted, I doubt if this be true. Nevertheless it has seemed proper for me to rule as to whether claimant,

notwithstanding its petition, should be awarded the relief which the documents evidencing its transactions with Pacat seem to justify.

In my opinion, claimant, although not entitled upon the present proof to the specific relief asked for in its petition, should be permitted to have any alternative relief warranted by the facts. The prayer in the petition asked for other and different relief. The question as to the dual nature of claimant's contention arose at an early stage of the hearings upon the Berardini claim, and any objection having to do with surprise upon the part of the trustee, or of other claimants, might easily have been overcome. Indeed, no objection upon the ground of surprise was put forth. The courts have been liberal in permitting amendments to claims, and in granting alternative relief where the rights of other litigants were not prejudiced. So far as I see, there can be no real prejudice here, save, perhaps, that further proof upon the tracing of the Berardini money may be necessary.

My conclusion is: I agree with the master in holding that none of the funds in Credito Italiano were appropriated in a legal sense to Berardini. The direction that such appropriation be made was dishonored, due to the overdrafts of Pacat. Upon such theory of appropriation, the claim must be disallowed. Since, however, the principle of concurrent condition should be applied to the Berardini-Pacat contracts, and as Pacat defaulted in performance, it should be said that the moneys obtained from Berardini were held in trust by Pacat. The claim accordingly will be allowed for tracing and marshaling.

From the record as now made up, it seems reasonably certain that none of the money on deposit in the city of New York to the credit of Pacat, as of the day of bankruptcy, or that is now on deposit in the city of New York to the credit of the trustee, represent payments made by Berardini. In order to recover therefrom, claimant must identify and trace his moneys into that specific fund. In re Jarmulowsky (C. C. A.) 261 Fed. 779. It is unnecessary, in consequence, that the marshaling and distribution of trust funds in the New York bank accounts should await any effort claimant desires to make in the way of tracing its money into foreign credits of the bankrupt. The principle to be used in marshaling is that described in Re Bolognesi & Co., 254 Fed. 770, 166 C. C. A. 216.

In view of the close relationship existing between the present claimant and La Banca M. Berardini, and the fact that the latter institution is now litigating in the courts of Italy with the receiver and trustee of the bankrupt estate as to the ownership of the same lire which are the subject-matter of this claim, and which are now on deposit in Credito Italiano, it seems proper that I should require, as a condition of granting relief to claimant, as hereinbefore set out, that the said litigation in Italy be ended, and that the said lire, or their equivalent in dollars, be transferred to New York, to await the outcome of claimant's effort to trace its funds, or a review by the Circuit Court of Appeals of my holding in reference thereto.

The record also indicates that, although the claimants Leonard Pasqualicchio and British Bank of Foreign Trade have had their

claims allowed, they cannot participate in the funds now available for distribution, in that they failed to trace their funds into the same.

The findings of the master as to the allowance or disallowance for tracing and marshaling of other claims, which I have not specifically mentioned, and upon which he has passed, are confirmed.

The fees of the special master will be fixed at $6,000. I seriously doubt if the payment to him of this sum will be compensatory, and if it thereafter be shown that the estate is reasonably able to pay a larger amount, application may be made therefor. Hearings incident to the reclamations have been many, and extended over a period of more than a year; not only this, but the matters involved have been intricate and confused, requiring close attention and the application of much time to their disposition. All of this the master has given, and through his directions the attorney for the trustee and other counsel have presented an excellent record, which, together with the master's report, has been of much help to the court.

The attorney for the trustee will likewise be allowed the sum of $6,000 for his services in connection with the reclamation.